047 Arthur Anderson v. Lockheed Go ahead. You know, when I was practicing, I always wanted to do this. I never had the opportunity to do it, so enjoy it. It's the only time I've had back-to-back. Good morning again, Your Honor. The Anderson appeal. Yes, go ahead. Can we start with jurisdiction? Of course. Just because I want to get that out of the way. Yes. So, unlike the prior appeal that we just heard, where I think there is really good reasons to hear both cases together, because the Davis case is a final judgment, and we have to hear that. And if we waited, another panel would have to hear the exact same thing. And so, we would be doing piecemeal appeals, God bless you. I have a hard time understanding, based on the district court's order and our evaluation, even under an abuse of discretion standard, how the no just delay finding could possibly be made here to overcome the general, not called prohibition, but the general sort of presumption against piecemeal appeals. For sure, Your Honor. I think it's important to recognize that we are dealing with different experts, for example. So Dr. Panagrahi is not the expert that's proceeding to trial in March with the birth defect cases. That's Dr. Warburton. And Dr. Panagrahi is involved in another case, but that's on a different docket. That's the Perotti case. And that's actually before this court anyway, because Lockheed Martin has taken an interlocutory appeal on the workers' compensation issue in that case. So we are dealing with an expert that is unique to this appeal. And secondarily, we're dealing with an injury, injuries that are unique to this appeal. So these are adult cancer cases. The birth defect cases that are proceeding are not that. They're cases that deal with... The problem is under that logic, in a case like this, where there's different cancers with different general causations, that would mean that we would essentially have to hear... It could be four, five, or six, depending on how many different cancers and experts you had, separate and independent appeals. And that seems to be contrary to the purpose of the piecemeal appeal rule, which is that we don't hear things piecemeal. What efficiency is gained... I know it's inefficient to you, but to the system, to us, to the court, to resources, by hearing this thing in a piecemeal fashion, rather than doing it as we always would do it, which is especially, you're going to have a trial done, most everything else has been excluded, we're not far away from the end of the tunnel, so unlike the red roof case, which was really early on, why would we do this as opposed to wait? Well, first, it was much earlier when we filed our notice of appeal. That's fair. We had some stays involved because of the jurisdictional issue. I think that itself led to some delay during the litigation. But secondarily, whether now or later, there are going to be unique separate issues. So whether or not Dr. Panagrahi's alleged plagiarism is enough that he's not qualified to testify won't be involved in a subsequent appeal from the birth defect cases. So it would be... On this issue, can you explain this to me? So there are a lot of plaintiffs in this case, right? So how many plaintiffs are affected by this ruling? I believe it's 29, but I believe seven of them are consortium cases. So my recollection is it's 22 for cancer and then seven like derivative cases. And so how many are going to trial that are not affected by this appeal? So three. So I mean, we'd be waiting then for the three to be resolved to address the 29. Correct, Your Honor. And why are these... And so, you know, it seems like one feature of this is that the reason we're here is because there are 30-something cases that are all combined into one case. Why are they... Why did they... How did they get here where they were all combined in one case instead of having separate individual cases? We could have filed them as separate individual cases. We tended to do that for the employees, but for the people who were environmental exposures that were working near the facility, basically the Gulf Channel employees and for the birth defects, their children. We filed those as one case, but we could have filed them as separate cases, which would have avoided this 54B issue if we had filed separate cases based on type of injury or specific plaintiffs. Okay. So I think I understand this now. So the reason that they were combined was because of the, like, the level of exposure or the way they were exposed as opposed to the results of the exposure, the cancer or the whatever that you say they got. Correct. That's the reason we used the same expert for these. So Dr. Panagrahi was our cancer expert for all of the cancer cases. We have a birth defect expert for all of the birth defect cases. And you just heard about Dr. Cantor who handled sort of the brain injury type cases. And yeah, so we've tried to divide them up by expert other than, for example, Davis, which was a workplace exposure. We did file those cases separately. Yeah, thank you. Going to the substance of the district court's decision, we believe that the district court made a credibility determination. I think the key language in the district court's opinion when it talks about plagiarism, when it sets up this is going to be the standard for the case, it says sometimes plagiarism can rise to, quote, deliberate lack of candor, end quote. And that's the exclusion standard that the district court established. There's certainly some, I will say the district court also was clear that he believes that credibility is not alone sufficient. He acknowledges the case law from that. That is not a basis to strike. But at some point, what I understand the district court to be saying, and correct me if I'm wrong, is at some point, the credibility is so tainted that it affects the reliability of the methodology itself. And so because of the nature of this credibility issue, I determine that there's just a liability problem in the gathering of evidence stage, the evaluation of evidence stage, and ultimately infecting the Bradford Hiltz stage. I believe the district court is saying that. But I believe that's a misstatement of the law. So this court has said credibility of determinations is the province of the jury. This court has said the jury has exclusive province over credibility. Right. But there's still the gatekeeping function. In other words, there's no doubt that that's true in terms of believing or not. And as I understand the district court, he's not saying I don't believe the expert. What he's saying is the reliability of his methodology by cutting and pasting over 100 pages of his report and selectively excluding some portions of it while he's doing it, that that affected the reliability of his evidence gathering, which he's required to do, of evaluating the individual evidence, which he's required to do, and then ultimately infecting the Bradford Hill analysis. How is that wrong? It's wrong because I believe the district court's credibility determinations are infused in there. And then secondarily, it's wrong because the expert report at issue here was easily divisible. So you had the Bradford Hill portion where Lockheed, they gave us this great color coded thing. The problem is there's no doubt that that's true. There's the A and the B, I'll call it. But the problem is Bradford Hill is an input test. In other words, the way it works is you gather all this stuff, you evaluate, you see if there's association evidence, you identify the negatives, and then you plug that in to the Bradford Hill and then weigh the negatives and the positives to see whether it spits out causation. If you put garbage in, you get garbage out. And so it seems to me that's what the district court is saying here is if you have a problem with what's going in, what comes out of the Bradford Hill is just not reliable. Why is that wrong? Because it's not garbage. So the Bradford Hill analysis is quite extensive and it gives analysis about individual studies and individual literature that supports it. So the expert does go through, the Bradford Hill portion of the opinion could stand on its own. It's nearly 100 pages going through each of these eight cancers. And the district court didn't consider that at all because of the initial input phase. And so I think a way that, I think that for me, the argument makes sense is a lot of times you have specific causation experts. And they have an initial portion of their opinion that's called medical records. Imagine the expert in that phase was copying and pasting from medical records without using quotation marks. They're still attributing it to where it came from in the record. But then you got the later portion, the portion that's the most important, where the expert explains their analysis. But the difference is that there, it seems to me between your analogy, and it's a good one, is that there's a judgment aspect that also is in phase one. In other words, selecting the studies and looking through them to find the negatives about those studies, which is what you're supposed to do at step one, is a judgment call. It's not just I'm laying out the medical records and then I'm evaluating those medical records. It's what I'm picking and choosing and how I am identifying negatives is important for what comes later. Does that not, is that out of the analogy that you have? It's not reliable if the expert does a bad job of picking and choosing, but that's not what we're talking about. We're talking about whether the expert used quotation marks. We are not talking about whether the expert didn't put the good evidence in or left the evidence out or excluded things that would impair the ultimate conclusion or the judgment in the Bradford Hill section. Is the Daubert question whether the expert's report is reliable or is the Daubert question whether the expert's opinion is reliable? I believe that is the latter, your honor. The issue here is one of drafting. It is the issue of whether the expert is correct. In his mind, he thought cutting and pasting for this portion was fine to just use footnotes. Like I'm pointing to where this came from. That's good enough in his mind and obviously the district court disagrees and the expert didn't do that in his subsequent opinion, which has been let through in the parotty case that's coming up to this court on kidney cancers or GI cancer. I apologize, but the analysis here is reliable. There is a reliable foundation and to ignore the eight different types of cancers at issue and ignore all of the literature out there and just say, we don't have to look at it because the expert didn't use quotation marks is something that this court has never condoned and no court has condoned. All of the plagiarism cases we're talking about are cases where experts stole another expert's report and didn't do the analysis and they just said, I did it. In this case, for example, and in a lot of cases that go on for some time, you end up having to replace experts because an expert retires, for example. In those cases, if you get a second expert and they just take the first expert's report and sign their name at the bottom, that's plagiarism, but the problem with that opinion is not that it's plagiarism, it's that the expert didn't do an analysis. It isn't just dumping someone else's analysis, the same thing. He just took one person and put it in there and said, these are the studies that they've done, and so I'm just putting it in there. But that's not what he did, Your Honor. Look at the Bradford Hill analysis. But that's a separate part. There's a first part. I agree with you on Bradford Hill. But there's a first part of it in the evaluation of what goes into the Bradford Hill analysis that he farmed out to somebody else, right? I believe that is incorrect, Your Honor. OK. Tell me why that's incorrect. I believe he actually looked at the literature and put in what he thought was pertinent. How can you do that if you cut and paste 100 pages from someone else's work? Because you don't have to quote at all in that section. That could have just been a study cited section. It could have just been the end notes. He didn't even need that section to survive under this court's precedent. The fact that he was laying it out there and saying, these are the studies, this is the body of evidence, that initial 357 pages is unnecessary to the remaining 96 pages. Thank you, Your Honor. May it please the Court. Ryan Hopper again for Lockheed Martin, the FLE. I'll start by just expressing some agreement before I disagree with opposing counsel. If you start with jurisdiction, the agreement might be there. That is exactly what the agreement is, Your Honor. What we have here is a well-encapsulated subset of all of the cancer claims from a unique expert in this case that are coming up together. Because as I believe Judge Brasher was driving it here, they probably should not have been filed in the same case as the other claims at all in the first instance. But regardless, this is not a situation under Rule 54B where the district judge certified a subset of claims asserted by some plaintiffs. All of the entire action, if we think about this in Rule 41 terms, is over with respect to these plaintiffs. That's true of every multi-plaintiff case. That what we've said in this context is, there should be one panel who decides everything. Sometimes we will burden a second panel. But when we do that, there has to be a good reason to do that. I'm paraphrasing a lot of law, but that's it. What's the good reason? Other than you guys really want this to be done. I get why you, as a matter of cost and convenience and lots of other things on your end. But we have to look at the public end. Why burden a second panel with this case? What's the good reason here? I understood the good reason in the first appeal, because we were already doing it. That makes sense to me. I'm having trouble understanding it here. When a second panel takes up the remaining claims in this case, which are going to be the three birth defect claims that come up, there will be very, very little overlap with the case before the court, such that it makes sense that there could be a second panel. The only overall... Can I ask you this? Were these ever going to go to trial together? Obviously, this was summary judgment here. But were there really going to be 30-something plaintiffs at trial with these different cancers and everything? Or were these going to be segmented out for trial in some way? That's a good question, Your Honor. I believe the procedural posture was that we, Lockheed Martin, had moved to sever all of these claims for trial. And I think initially that was granted. Your Honor, I don't have a citation for that at the moment. But I guess, I mean, it just strikes me as someone that... I did this kind of work occasionally. You could clump all this stuff together for discovery and for sort of pretrial proceedings and to kind of winnow down the claims. But when you got to trial, you were not going to have all of these people at once. So I don't know how that necessarily cuts. But it just seems like this was always going to be sort of separate. You're exactly right, Your Honor. And in that sense, it's functionally the same as taking individual appeals from Bellwether trials and the Deepwater Horizon cases. I mean, this was structured as a... We have that tomorrow. And that may be a problem also. Well, this was... One more question just about that. So if they had been severed for purposes of trial, would we have disjointed appeals from those trials? Or would we be waiting until after all of the cases were tried before we would be hearing appeals? You would be able to take an immediate appeal. I mean, it's a final judgment. It's at that point, I think, not even fairly characterized as a Rule 54B judgment. But for all practical purposes, it makes sense not to hold up the judgment of one Bellwether group while we're waiting on a different Bellwether group with different health conditions and different experts. That's the efficiency in this. I'm just trying to distinguish a case. And it may make good sense here. But what we essentially would be authorizing is, let's say there's six or seven different tranches that happen to be bundled up in the same thing. And with a different expert for each one because it's a different disease for each one of them. Different chemicals associated with each one. That we would essentially be blessing seven different appeals and seven different 54Bs because it's just efficient to do that and they're separate. And it just so happens by the plaintiff deciding to put them together that they're all together. And that may be what the law is. But I'm having trouble separating that situation from seven different certifications and seven different panels having to learn at least a lot of this case, not all of it, from what we have here. We would ask this court to take this case and the facts before it. Whether that would make sense in a different case with more plaintiffs that have already, with claims that have already been filed, I think is an interesting question, but not one that we have here. We're very close to the end of the judicial labor. And... That factor, we've said, weighs in favor of not taking it. In other words, in Red Roof, what we said is, one reason to take it is because it was so early on in the case there hadn't been a lot of work in. But being at the end of the tunnel would seem to indicate we should wait. Well, I'll echo my opposing counsel's sentiments that when these went up, we were not, we didn't know, frankly. I mean, and the fact that we're close to the end of the case here is just a function of success and other summary judgment motions. There's no way, had we been less successful, the horizon of these cases could be decades long. On the merits, so one issue that I, I just am generally concerned about this issue is that it seems like when district courts are analyzing whether experts are reliable or not, they're focusing on the expert report instead of, for example, holding a hearing where they can have the expert testify, right? And when I look at Rule 26 and what it requires from an expert report, it requires disclosure of stuff. You know, it doesn't require, you know, the expert to justify himself. I just, you disclose your opinions, you disclose the data, you disclose exhibits, you disclose qualifications. That's just a general concern that I have. Three, three thoughts that are responsive to that concern, Your Honor. First, this is a trial judge who tried a lot of cases in this case. And consistent with Your Honor's concern, we do have the disclosures required in Rule 26, which are all of the reasons and basis for the expert's opinion. But we also had a case management and scheduling order in this case that made very clear that any opinion with a supporting rationale that's not disclosed in expert reports is not going to be considered a trial. So there were additional warnings and safeguards if that's one of the issues Your Honor is concerned about. Another point that I would remind the court of is there was a hearing here. It wasn't an evidentiary hearing, but it was a day-long general causation hearing at which we played video clips of Dr. Panigrahi, for example, when he was being asked at his deposition about the conduct in his expert report. And to call the conduct here just an omission of quotation marks is frankly a gross mischaracterization of what Dr. Panigrahi did here. So the district court here had an opportunity to go through not just the deposition testimony, but to see the videos. And I'll direct the court, if the court doesn't mind, to Doc 210-1, which is the presentation that we presented to the district court at the district court level. In that, we not only went through why Dr. Panigrahi's plagiarism here. I mean, to use the term plagiarism is almost to minimize what happened. I want to put this, I want to get to where you're going because I want to ask you questions about it. But I want to put this in the context of reliability because that's what the district court decided. Right. One of the steps for epidemiological reliability is that in identifying associations, you have to identify the biases and negative parts of the reports, right? Right, exactly. And so going to the chart that you have, as I understand it, for one of them, one of the relevant reports that were embedded in the copied report, there was a part that said,  there was little evidence of an exposure response effect, but the work group noted that and then so-and-so. He took out, the doctor, took out that first part, which was a limitation on how the report, on how the study had found, right? Exactly, Your Honor. There was another part. This is that, if you look at his report or look at the real report, docket entry 136-1 at 244 or 136-7 at 246. The work group also noted, however, that mortality from cancer of esophagus was in excess, possibly supporting an effect of smoking. In other words, there was another possible cause for the cancer that was at issue in that case. Exactly, Your Honor. What do we do with that in terms of reliability? How does that enter into the reliability analysis? It's directly relevant to the reliability analysis, Your Honor. And I'll note the notion that the Bradford Hill analysis that followed the analysis that Your Honor is referring to is separable, is not true. And it's not what Dr. Panagrahi said. Before he was confronted with the plagiarism and his deposition, he was asked how the two sections of this report relate. We addressed this on page 12 of our initial brief and it appears at page 43 of his deposition, document 136-3. He said that the design and qualification analyses, the limitation analyses that Your Honor is referring to, those appeared in the chemical sections of his report, not the Bradford Hill sections. And those chemical sections of his report are what he plagiarized and misrepresented from IARC. And it is no coincidence, Your Honor, that at a macro level, IARC did not find sufficient evidence for causal conclusions of causal relationships for the overwhelming majority of the relationships alleged here. 44 out of the 45 alleged here. And he did not disclose that. So we have an expert. I have a question about the relationship between the first half and the second half. Yes, Your Honor. It's my understanding the second half, the first half is about cancer generally and the second half is about specific cancers. Am I understanding the split? Not exactly, Your Honor. The first half was broken down by substances. In other words, at the time of the general causation report, I believe there were seven different substances. It was later reduced to five. But within those, so that was the section that Dr. Panagrahi purported to have conducted his individualized analyses about the strengths and limitations of the studies specific to the substances. And so those are the portions of his report where had he actually performed the methodology he claimed to have performed. And as a reminder, he told the district court that he performed a type of methodology that the district court correctly concluded he did not actually perform. But had he done that, had he actually performed those limitation analyses himself, they would have appeared in the plagiarized and misrepresented sections of his report. But he didn't. What he did, and what's clear as a bell from the document 136-4, I would commend to your attention, Your Honor, is a section, it's a version of Dr. Panagrahi's expert report where we went through and painstakingly did the best we could to identify not just the plagiarism, but the misrepresentations. And I would suggest just do a search for left out or excluded. And that'll start teeing up all the things that Dr. Panagrahi excised from his expert report. One example that goes to the concept of specificity of association, the IR working groups that were performing these analyses frequently pointed out that where they saw associations between a substance and a cancer type, it was specific to that type of cancer and not to the types of cancer in our case. And Dr. Panagrahi systematically removed those sorts of comments and never anywhere in his 500-page expert report disclosed that the people that he took his analyses from reached a contrary conclusion to his own. So then put yourself in the district court's shoes and a reliability gatekeeping analysis, understanding that you, the district court, the reason that we defer to district courts in this context is because they're uniquely entrusted to protect the integrity of judgments in federal courts that rest on expert testimony. And when they have to do that, number one, the primary objective is to ensure that the expert applied the same level of intellectual rigor, which this court, the district court acknowledged. Number two, we cannot take the expert's word for having applied a methodology, which in this case, there's ample evidence that he did not. And number three, the district court got this court's precedent on credibility exactly correct. We see half citations to this court's rank precedent. The district court cited this, Appellant cited it. In footnote seven of Rink versus Kamenova, the first half supports Appellant's argument. It says a district court cannot exclude an expert because it believes the expert lacks personal credibility. And you see the quotation stop there sometimes, but it goes on and says, because of prior bad acts or other prior instances of untruthfulness, those are general credibility issues for a jury. But the next line says,  in evaluating the reliability of an expert's method, however, a district court may properly consider whether the expert's methodology has been contrived to reach a particular result, which is precisely what happened here. And I would just ask this court to consider the rule that would follow if you were to accept Appellant's argument. And that is an expert could insulate his opinions from reliability review by lying about the methodology he implied or by misrepresenting the underlying sources. And if those methodological misrepresentations were purely jury credibility issues, then this court or the district court below could never assess reliability. Of course, that's not the law. Another question. So why isn't the right way to address this situation through a discovery sanction or something like that? So, for example, striking an expert because the report failed to satisfy Rule 26, as opposed to doing a Daubert analysis and analyzing the report through the lens of reliability. The district court's precedent in McLean and other cases emphasize that the district court's keeping responsibilities, they're not lowered when there are going to be dispositive effects. In other words, the discretion afforded to district courts in this context are not lowered just because a exclusion of expert testimony might be outcome determinative. So, Your Honor, I agree. I guess I'm not suggesting that. I guess I'm suggesting when we're focused not on the experts' opinions as expressed in deposition testimony, we're focused on the way the expert report was prepared. Why isn't that a discovery issue as opposed to a Daubert issue? And I mean, I think in some cases that could rebound to your favor, right? Because you could strike the expert like way earlier in the case. But why isn't that what's really going on here is a discovery problem as opposed to a Daubert problem? Under the right procedural posture, if the dispositive motions deadline, for example, hadn't passed here, if the expert disclosure deadline hadn't passed here, then perhaps there could be a discovery sanction that could suffice and allow the case to move forward. But here, the district court and the exercise of its administrative responsibilities made clear deadlines for complete Daubert disclosures and expert reports, then had a Daubert and dispositive motion deadline. And all of that had passed by the time the summary judgment and Daubert briefing on this was brought to the court's attention. And it remains the responsibility of the plaintiffs who have both the substantive burden of proof and the burden of establishing reliability under 702 to substantiate the experts' opinions. They had ample opportunities to do that. We had the hearing, I referred to, Your Honor, earlier and Dr. Panagrahi simply did not substantiate his opinions. And the reality is the district court's good work here, which deserves deference, identified that he misrepresented and simply did not apply the methodologies he said he did. That's a reliability issue. And we ask the court to affirm the judgment below. The district court's abuse of discretion is highlighted by the fact that we are dealing with individual types of cancer and none of us are talking about them. We have plaintiffs who have been diagnosed with kidney cancer, breast cancer, thyroid cancer, pancreatic cancer, liver and bile duct cancer, testicular cancer, Hodgkin's disease,       not Hodgkin's lymphoma, and leukemia. We are talking about them all identically as if the failure to use quotation marks or to put the word confounding in one of them means that the expert cannot testify about the other. Opposing counsel and the district court don't even identify how these supposed weaknesses or alleged weaknesses or inadequacies in certain statements by IARC mean that, or by the studies themselves, mean that the body of the evidence is not adequate, is not reliable to find a foundation or to support an expert opinion that the medical literature more likely than not supports causation, that these things can be caused by the chemicals at issue. We are ignoring the literature altogether under the guise of Daubert. This is not what Daubert was about. We are blindfolding a jury in this case because an expert did not use quotation marks. This is about quotation marks. If quotation marks had been used in the original two-thirds of the report, we would not even be here. And there were footnotes throughout. We would be guaranteed to say, everyone here, including opposing counsel, that the inadequacies in these studies that weren't highlighted by a plaintiff's expert go to cross. There's no doubt in our minds under quiet technology and the following cases that this court has said, in most cases, objections to the inadequacy of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility. This court has never required and the Supreme Court has never required an expert to identify every potential weakness in the medical literature in their report. This is about whether this court has looked at and the Supreme Court has looked at whether the body of literature, as analyzed by the expert, is sufficient to say that causation is more likely than not. The district court did not do that analysis. And Lockheed is asking this court to not do that analysis either. And I also don't think this court should do that analysis. This court should remand and tell the district court that you have to look at these conditions and the literature that's being cited in 96 pages by an expert who separates them out by condition and analyzes the literature by condition and says for each of the Bradford Hill viewpoint slash factors how in his view, based on his experience, the evidence is more likely than not. He did not exclusively rely on IARC. He did cite to IARC, but he cited and analyzed the underlying literature and this court should ask the district court and tell the district court to look at that. Thank you. Thank you, counsel.